

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed July 8, 2013

United States Bankruptcy Judge

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ALTON ALEXIS AND, | § | Case No. 11-31701-HDH-7 |
| ALTHEA LYNETTE ALEXIS | § | |
| | § | |
| Debtors. | § | |
| | § | |
| WILLIAM T. NEARY, | § | |
| UNITED STATES TRUSTEE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adversary No. 11-03628-HDH |
| | § | |
| ALTON ALEXIS AND, | § | |
| ALTHEA LYNETTE ALEXIS | § | |
| | § | |
| Defendants. | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. **<u>Findings of Fact</u>**

1. Debtor, Alton Alexis, is a real estate investor and developer.

2. Alton Alexis was also a principal in a failed Chapter 11 case before Judge D. Michael Lynn, *In re Nextstep Accomodation, LLC*, Case No. 07-40331-dml-7.

3. Debtor, Althea Alexis, is a medical doctor who is the sole partner of A. Lynette Alexis MD PA ("Alexis PA").

4. On March 3, 2011, Debtor, Alton Alexis, d/b/a A&A Mortgage Services, received a letter from Dale Property Services, LLC ("Dale"), representing that Chesapeake Energy ("Chesapeake") had engaged Dale to "acquire oil, gas and mineral leases."

5. On March 11, 2011, the Debtors filed their *pro se* voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

6. John H. Litzler is the Chapter 7 Trustee ("Trustee") assigned to this case.

7. The Debtors filed their original schedules of assets and liabilities on the petition date, March 11, 2011. The Debtors listed more than $4 million in business related unsecured debt.

8. The original section 341 meeting of creditors was scheduled for April 13, 2011, but it was rescheduled to June 15, 2011.

9. The Trustee conducted the first section 341 meeting of creditors on June 15, 2011.

10. The Trustee conducted the second section 341 meeting of creditors on July 13, 2011.

11. The Trustee conducted a third section 341 meeting of creditors on August 16, 2011.

Income Tax Refund

12. In April 2011, the Debtors filed their 2010 federal income tax return, which ultimately resulted in a $54,349 tax refund. Such amount is consistent with the refund amount they received for their 2009 taxes.

13. The Debtors did not disclose a tax refund on their original schedules.

14. The Debtors provided "None" for No. 18 on Schedule B, which asks for "[o]ther liquidated debts owed to debtor[s] including tax refund." Debtor Alton Alexis testified that he did not know he would receive a tax refund because of taxes owed to the IRS. However, the schedules filed with this Court do not list such claims. Alton Alexis' testimony on this issue was not credible.

15. The Debtors did not exempt their 2010 federal tax refund on Schedule B.

16. The Debtors signed their original schedules under penalty of perjury.

17. The Debtors received the refund and did not inform the Trustee of the receipt. Instead, the Debtors used the $54,349 tax refund to pay personal expenses, including $4,000 in car payments, $7,000 in attorneys' fees, $23,000 in property taxes, and $21,600 in mortgage payments.

18. On May 22, 2011, the Debtors filed their Amended Statement of Financial Affairs, disclosing their receipt of the 2010 federal tax refund of $54,349. However, by that time they had spent the refund.

19. The Debtors never amended Schedule B to include the 2010 federal tax refund.

20. Based on the testimony and evidence offered at the hearing, the Debtors concealed and transferred their 2010 federal tax refund after filing for bankruptcy with the intent to hinder, delay, or defraud their creditors and the Trustee.

<u>Mineral Interests</u>

21. The Debtors did not list mineral interests in their original schedules.  Instead, the Debtor's original Schedule A listed only two pieces of real property: their homestead, located at 7020 Shadow Creek Circle, Fort Worth, Texas 76132, and another lot, located at 6316 Pecan Circle, Alvarado, Texas 76009.

22. Both Debtors signed the original Schedule A under oath.

23. On May 25, 2011, Debtor, Alton Alexis, d/b/a A&A Mortgage Services, entered into three oil and gas leases (the "Leases") with Chesapeake Exploration, LLC as lessee for the lease of mineral interests in three lots in Tarrant County, Texas (the "Mineral Interests").  Alton Alexis received three checks totaling $2,000 in exchange for signing the Leases.  He cashed the checks, he testified, rather than depositing them because his bank accounts were frozen.  This testimony is inconsistent with the testimony of his wife, Althea Alexis.  Alton Alexis' testimony on this point is not credible

24. All three checks were from Dale Operating Company and dated June 2, 2011.

25. The Trustee had no knowledge of the Mineral Interests or Leases until June 29, 2011, when the Debtors amended Schedule A to disclose their Mineral Interests.  By that time, the money had been spent.

26. The Debtors' Amended Schedule A lists mineral rights in the following properties:

    a. 2 lots on Como Drive in Fort Worth, Texas in the Chamberlain Arlington Heights Addition, and

    b. 1 lot in Fort Worth, Texas.

27. Amended Schedule A lists the value of these mineral rights as "unknown."  This valuation is problematic, to say the least.

28. The Mineral Interests and Leases are property of the estate.

29. Based on the testimony and evidence offered at the hearing, the Debtors concealed or transferred their mineral interest proceeds after filing for bankruptcy with the intent to hinder, delay, or defraud their creditors and the Trustee.

Medical Practice

30. Althea Alexis has worked for the Fort Worth Women's Clinic, as a practicing physician, since January 1, 1997. She is the sole member of the Alexis, PA, which is a partner in the Fort Worth Women's Clinic.

31. The Alexis PA originally contributed $60,000 to the Fort Worth Women's Clinic in 1998.

32. On March 10, 2011, the Alexis PA filed a 2010 federal tax return that reflected the value of its interest in the Fort Worth Women's Clinic as $88,156.

33. The partnership agreement governing the Fort Worth Women's Clinic provides for a thirty-six month payout of a withdrawing partner's capital account, and the Fort Worth Women's Clinic's records show a balance of $91,911 in the capital account of Alexis PA as of the petition date, March 11, 2011.

34. The Debtors did not disclose their interest in the Alexis PA on their original schedules filed on March 11, 2011.

35. Both Debtors filed the original Schedule B under oath.

36. The Debtors disclosed their interest in the Alexis PA on their amended schedules filed May 22, 2011. Specifically, the Debtors' amended Schedule B provides that "ALTHEA LYNETTE ALEXIS, MD, PA is a professional corporation solely owned by the Joint Debtor … Althea Alexis and is used by her as a practicing physician" and "[t]he

corporation is retained by the Fort Worth Womens' Clinic located at the Harris Southwest Hospital, 6100 Harris Parkway, Suite 200, Fort Worth, TX."

37. The Debtors disclosed their interest in the Alexis PA on an addendum to their original Statement of Financial Affairs. Specifically, the Debtors provided that "ALTHEA LYNETTE ALEXIS, MD, PA., is a professional corporation solely owned by the Debtor, Althea Alexis, and is used by her as a practicing physician."

38. The Debtors did not make any assertions as to the value of their interest in the Alexis PA on their original Statement of Financial Affairs.

39. On May 22, 2011, in their amended Schedule B, the Debtors declared that the partnership between Alexis PA and the Fort Worth Women's Clinic was "dissolved when Joint Debtor filed bankruptcy on March 11, 2011."

40. The medical practice, its value, and the Trustee's difficulty in obtaining information are not the subject of this adversary proceeding. However, the surrounding facts are evidence of the Debtors' intent regarding the 2010 income tax refund and Mineral Interests. These Debtors were not forthcoming.

41. Both Debtors signed their amended schedules, including Schedule B, under oath.

42. The Trustee and his professionals, through communications with the Debtors' counsel, attempted to compel the Debtors to voluntarily turn over the tax refund and lease bonuses.

43. On October 11, 2011, Trustee's counsel, Kathryn Reid, communicated with the Debtors' counsel regarding the turnover of their 2010 federal income tax refund, the transfer of the estates' Mineral Interests, and the cash bonuses received in exchange for these mineral transfers. Kathryn Reid's testimony on this point, and overall, was credible.

44. Despite the Trustee's repeated requests, the Debtors did not turn over the tax refund or lease bonuses because they had already spent the money on personal expenses.

45. After numerous attempts to collect the tax refund and lease bonuses on behalf of the estate, on December 12, 2011 the Trustee filed his *Complaint to Deny Discharge and For Turnover of Estate Property*, adversary proceeding case no. 11-3628, alleging that the Debtors failed to disclose or turnover either the 2010 federal income tax refund or the mineral lease payments.

46. The Debtors and the Trustee reached a partial settlement agreement in which the Debtors paid the Trustee $86,349.

47. The $86,349 covered the $54,349 income tax refund, $2,000 for post-petition leases of the Mineral Interests, $5,000 for hospital shares, and $25,000 in administrative fees and costs incurred by the Trustee and his professionals in connection with the adversary.

48. The Debtors were also required to turn over twenty percent of their 2011 income tax refund to the Trustee.

49. The settlement agreement also provided that the Trustee would dismiss all claims against the Debtors except an objection to discharge with the United States Trustee being substituted as the prosecuting party.

50. The Bankruptcy Court entered an order approving the settlement agreement on July 2, 2012.

51. The bankruptcy papers in this case contain a number of inaccuracies. By way of example, they inaccurately list the principal place of business and assets of Debtor Althea Alexis. The schedules do not reflect property tax obligations, which were paid by the Debtors from the tax refund.

52. For the benefit of any reviewing courts, Defendant Alton Alexis is culpable for both the tax refund and Mineral Interest issues.  Althea Alexis was the check writer for the misuse of the tax refund.  She also signed the schedules that contain omissions and inaccuracies.  However, she appears to have no role in the sale of the Mineral Interests.  Nevertheless, the U.S. Trustee has met his burden of proof as to both Debtors.

53. To the extent a finding of fact is more properly considered to be a conclusion of law, it is so construed.

B. **Conclusions of Law**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Section 727(a)(2) of the Bankruptcy Code provides that the Court shall grant the debtor a discharge unless the debtor has, with intent to hinder, delay, or defraud a creditor, transferred property of the debtor or the bankruptcy estate after the filing of the petition.  11 U.S.C. § 727(a)(2)(B).  In order to establish that a discharge should be denied under § 727(a)(2)(B), the moving party must show 1) a transfer or concealment of property of the estate; 2) belonging to the debtor; 3) after the filing of the petition; and 4) with intent to hinder, delay, or defraud creditors or an officer of the estate.  *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005), *citing Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989).  Concealment may be established by showing a transfer of property coupled with a retention of the benefits of ownership.  *Bradley v. Ingalls (In re Bradley)*, 501 F.3d 421, 434 (5th Cir. 2007), *citing Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 553 (5th Cir. 1987).

3. Evidence of a debtor's actual intent to defraud creditors is required to deny a debtor his discharge; constructive intent is not enough. *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989). However, the intent to hinder, delay, or defraud may be inferred by a debtor's actions and proven by circumstantial evidence. *Id.*; *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 764 (Bankr. N.D. Tex. 2005).

4. Circumstantial factors that tend to prove an intent to hinder, delay, or defraud include: "(1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry." *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 702 (5th Cir. 2003) (quoting *Chastant*, 873 F.2d at 91).

5. With the intent to hinder, delay, or defraud their creditors and the Trustee, the instant Debtors transferred or hid property of the bankruptcy estate post-petition.

6. The Debtors failed to disclose assets on their original schedules and statement of financial affairs. In particular, the Debtors failed to disclose their 2010 federal income tax refund and their Mineral Interests.

7. The Debtors failed to turn over their 2010 federal income tax refund to the Trustee, despite his requests through counsel. The Debtors claim that they were unable to turn over the assets because the money had already been spent, but the Debtors used the funds

to pay for their own personal expenses. Because the Debtors failed to turn over the assets, the Trustee had to file a complaint objecting to discharge.

8. A debtor's failure to accomplish a fraudulent scheme should not be the basis for denial or discharge. *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 569 (7th Cir. 1989). Accordingly, that the Debtors ultimately paid $86,349 to the Trustee, pursuant to their settlement agreement, does not change the fact that the Debtors concealed assets with an intent to hinder, delay, or defraud their creditors.

9. The numerous inaccuracies in the schedules paired with the nondisclosures, use of the 2010 federal income tax refund, and the post-petition sale of the Mineral Interests all support a finding of improper intent by the Debtors. While not every error in a bankruptcy case leads to the denial of discharge, in this case one is led to conclude that the Debtors acted intentionally in failing to list the income tax refund and then spending it and in failing to list the Mineral Interests and then selling them. Based on the testimony and evidence offered at the hearing, the Debtors' failure to fully and properly disclose was not the result of an innocent mistake by pro se debtors. The Debtors are both educated with sufficient sophistication to know that they should have disclosed the federal income tax refund and the Mineral Interests.

10. Although the evidence against Althea Alexis was not as strong as the evidence against Alton Alexis, both Debtors signed their schedules under penalty of perjury. She was the check writer for the wrongful use of the tax refund. Both Debtors signed the schedules with the omissions. Therefore, the Complaint is granted and discharge as to both Debtors shall be denied.

11. To the extent any conclusion of law is more properly considered to be a finding of fact, it is so construed.

12. U.S. Trustee's counsel shall submit a proposed judgment to the court for signature within fourteen days from the date of entry of these findings and conclusions.

### END OF ORDER ###